UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ROBERT E. BERG,                              )
                                             )
            Plaintiff,                       )
                                             )         CIVIL ACTION NO.
VS.                                          )
                                             )         3:05-CV-1215-G
SAGE ENVIRONMENTAL                           )
CONSULTING OF AUSTIN, INC.,                  )              **ECF**
                                             )
            Defendant.                       )

**MEMORANDUM OPINION AND ORDER**

Before the court are cross-motions for partial summary judgment by the

plaintiff Robert E. Berg ("Berg") and the defendant Sage Environmental Consulting

of Austin, Inc., ("Sage").  For the reasons stated below, the motions are granted in

part and denied in part.

I.  BACKGROUND

This dispute arises from an employment relationship gone awry.[1]  In 2003,

Berg worked for Environmental Resources Management-Southwest, Inc. ("ERM") as

---

[1]       While many of the facts in this case are hotly disputed, the court will do
its best to summarize and present the pertinent facts in a manner whereby it is clear
which facts are contested.

an environmental engineer and client service manager.  Memorandum in Support of

Motion for Partial Summary Judgment to Determine Applicable State Law and

Dismiss Defendant's Counterclaim ("Berg Motion") at 7.  After a significant period of

employment, Berg became dissatisfied with ERM and began exploring other

opportunities.  *Id*. at 8-9.

In early 2003, a Sage employee contacted Berg at a professional meeting in San

Diego, California.  Berg Motion at 11.  Through the process of conference meetings,

telephone conversations initiated in Texas to Berg in Louisiana, and emails between

the parties, Sage and Berg negotiated the terms of a possible employment relationship

-- the ultimate goal being the opening of a Sage branch in Baton Rouge, Louisiana.

*See* Berg Motion at 11-19; Defendant Sage Environmental Consulting of Austin,

Inc.'s Response to Plaintiff's Motion for Partial Summary Judgment ("Sage

Response") at 3.  A Sage representative, Chris Swanberg ("Swanberg"), traveled to

Louisiana multiple times to negotiate with Berg.  Berg Motion at 13-14.  On June 19,

2003, Swanberg emailed an offer of employment to Sage.  *Id*. at 14; Sage Response at

3.

The facts thereafter are in dispute.  In early July, Berg traveled to Houston to

meet with Scott Muller ("Muller"), President of Sage, and Steve Probst ("Probst"),

CEO of Sage.  Berg Motion at 14.  Sage maintains that this meeting was necessary

because -- as Berg had yet to accept -- the original June 19 offer letter had expired.

Sage Response at 4.  Swanberg prepared a revised offer letter after this meeting in which an additional provision was added:  "Sage is also offering a bonus of $30,000 dollars for your acceptance of this employment offer, paid on the first payroll date after your date of hire, but contingent upon completion of one year of service."  Berg Motion at 14.  Berg contends that he had already accepted the June 19 offer letter, *id.*, while Sage argues that Berg accepted the offer of employment during the meeting in Texas, and the revised offer letter merely reflected the parties' new agreement. Sage Response at 4-5.

During the weekend of July 4, 2003, Swanberg traveled to Louisiana to deliver the revised offer letter to Berg.  Berg Motion at 14-15.  The revised letter given to Berg was backdated to June 19, 2003.  *Id*. at 15.  Swanberg handed Berg the offer letter, Berg immediately placed it in his file without reading it, and Berg delivered to Swanberg his acceptance letter -- already signed -- dated July 3, 2003.  *Id*.  Swanberg then signed this letter and the deal was complete.  *Id*.  What was not contained within the offer letter and acceptance, however, is also in dispute between the parties. Berg contends that Probst promised to indemnify Berg from any possible litigation resulting from his defection from ERM to Sage.  *Id*. at 22.  Probst also agreed to award Berg a $150,000 signing bonus, and then proposed to structure it for tax purposes as a real estate transaction.  *Id*.  This transaction would involve Sage purchasing Berg's property in Louisiana: Berg would remain caretaker and would then

have the option to buy the property back at a price guaranteeing him $150,000 net cash retained.  *Id*.  This transaction never occurred, however, and both the promises of indemnity and $150,000 bonus remained unwritten.

Effective July 7, 2003, Berg resigned from his position at ERM to accept his position at Sage.  Berg Motion at 7.  On the same day, fellow ERM employees Omer Wolff and Sharon Hampton resigned their positions to accept offers with Sage.  *Id*. at 19.  On July 14, Randi Wyatt, Veronica Rome, Patrick Passantino, Brady Fontenot, and Brandon Bencaz also left ERM to join Sage.  *Id*. at 19-20.  Shortly after Berg's resignation, ERM filed suit against Berg alleging multiple breaches of duty.  Sage Response at 6.  Berg also filed two declaratory judgment suits against ERM. Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment ("Berg Response") at 9.  After some time, ERM's suit was settled in a manner whereby neither party received money.  Sage Response at 6.  Sage, however, contends that Berg received compensation in this settlement: permission to sell approximately $400,000 worth of ERM stock he owned.  *Id*. at 6 n.28.

The new employment relationship, however, quickly deteriorated.  In early 2004, Sage reduced Berg's compensation via a "revised offer letter."  Sage Response at 6; Berg Motion at 21.  Berg's salary was reduced from $175,000 to $150,000 and Sage terminated Berg's deferred compensation of $75,000 so that he would only receive $20,540.66.  Sage Response at 6; Berg Motion at 20.

On June 18, 2004, Berg voluntarily resigned from his position at Sage.  Berg Motion at 2.  On December 15, 2004, he filed suit in the United States District Court for the Middle District of Louisiana, seeking compensation, indemnification for litigation involving ERM, penalty wages, and attorneys' fees based on the demise of his relationship with Sage.  Docket Sheet; Complaint.  In early 2005, Sage filed a motion to transfer venue, pursuant to 28 U.S.C. 1404(a), "for the convenience of the parties and witnesses, and the interest of justice."  Docket Sheet; Defendant Sage Environmental Consulting of Austin, Inc.'s Memorandum in Support of its Motion to Transfer Venue at 2.  This motion was granted on June 8, 2005, and the case was transferred to this court.  Docket Sheet; June 8, 2005 Ruling on Motion to Transfer Venue.  On July 25, 2005, Sage counterclaimed for the $30,000.00 signing bonus delivered to Berg, but not repaid after his resignation.  Docket Sheet; Defendant Sage Environmental Consulting of Austin, Inc.'s First Amended Answer and Counterclaim. In early 2006, both parties filed motions for partial summary judgment.  Docket Sheet.  These motions are now ripe for decision.

II.  ANALYSIS

A.  Applicable Law

As a preliminary matter, and as a requested issue in Berg's motion for partial summary judgment, the court must determine whether Louisiana law governs Sage's counterclaims.  Berg argues that Louisiana choice-of-law rules should apply and would

subsequently result in a conclusion that Louisiana law governs Sage's claims brought against Berg.[2]  Berg Motion at 26-31.  Sage counters with an argument that the choice-of-law analysis would be futile -- both Louisiana and Texas substantive law result in the same conclusions, so the court does not need to engage in a choice-of-law analysis.  Sage Response at 9-10.  In addition, Sage argues that engaging in such an analysis would deprive the parties of a trial on the merits; because there are genuine issues of material fact involved in the choice-of-law analysis, resolving this issue would consequentially dispose of the case.  *Id*. at 11-16.

This case was transferred to this court from the United States District Court for the Middle District of Louisiana under the provisions of 28 U.S.C. § 1404(a).  When the defendant in a diversity suit successfully moves for transfer of venue under § 1404(a), the transferee court must apply the law and policy of the transferor state.

---

[2]     The court notes that although Berg states in his motion for partial summary judgment that he is requesting a determination that Louisiana law applies to *all* claims in this suit, Berg Motion at 1 ("partial summary judgment is therefore appropriate to determinate [sic] that the laws of the State of Louisiana, as opposed to the laws of the state of Texas must be applied in determining the outcome of Berg's claims arising under his employment agreement"), he later states that his "motion for partial summary judgment is directed at the Sage counterclaims."  *Id*. at 26.  Because Berg then proceeds to analyze only Sage's counterclaims under different conflict-of-laws methodologies, the court will assume that Berg did not move for partial summary judgment on the applicability of Louisiana law to his own claims against Sage.  This conclusion, therefore, disposes of Sage's argument that the court would be rendering an advisory opinion if it engaged in a choice-of-law analysis for each and every claim against Sage.  *See* Sage Response at 8 (arguing that the court's ruling that Louisiana law applies to Berg's claims "would, in essence, constitute a ruling in a vacuum and be nothing more than an advisory opinion").

*Industrial Indemnity Company v. Chapman and Cutler*, 22 F.3d 1346, 1350 (5th Cir. 1994); *Cowan v. Ford Motor Company*, 713 F.2d 100, 104 n.6 (5th Cir. 1983) (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964)).  Accordingly, this court must apply Louisiana choice-of-law rules in determining which jurisdiction's law will apply to this action.

Under Louisiana's general residual conflict-of-law rule, the court should apply "the law of the state whose policies would be most seriously impaired if its law were not applied to that issue."  LA. CIV. CODE ART. 3515.  To perform this analysis, the court must evaluate "(1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state."  *Id*.  The specific provisions governing choice of law for conventional obligations and for delictual and quasi-delictual obligations focus on similar concerns, requiring the court to consider the relation of the state to the parties and to the events giving rise to the dispute.  *See* LA. CIV. CODE ARTS. 3537[3] & 3542[4];

---

[3]     Article 3537, concerning conventional obligations (contracts) provides:

> [A]n issue of conventional obligations is
> governed by the law of the state whose
> policies would be most seriously impaired if
> its law were not applied to that issue.

(continued...)

[3](...continued)

> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

LA. CIV. CODE ART. 3537.

[4]   Article 3542, the provision concerning delictual (tort) or quasi-delictual obligations, provides:

> [A]n issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the

(continued...)

- 8 -

see also *West Coast Liquidators, Inc. v. Commerce & Industry Insurance Company*, Nos. 98-2200S/W, 97-803, 97-775, 1999 WL 52150, at *4 (E.D. La. Feb. 1, 1999). However, the Fifth Circuit has observed that "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary." *Schneider National Transport v. Ford Motor Company*, 280 F.3d 532, 536 (5th Cir. 2002) (quoting *W.R. Grace & Company v. Continental Casualty Company*, 896 F.2d 865, 874 (5th Cir. 1990); *National Union Fire Insurance v. CNA Insurance Companies*, 28 F.3d 29, 32 n.3 (5th Cir. 1994)). Instead, the law of the forum state applies if the court finds that there are no conflicts between the laws of the applicable states. See *id*.

Without consideration of any disputed facts, it appears that Louisiana law should govern this dispute. Although the court is directed to engage in a separate choice-of-law analysis for each issue, *Favaroth v. Appleyard*, 785 So. 2d 262, 265 (La. App. 4 Cir.) ("Under Louisiana's choice of law rules, a sweeping determination that the law of one state applies to the case, as opposed to an issue in a case, constitutes a derogation of the appropriate analysis. When a conflict exists with regard to more than one issue, each issue should be analyzed separately."), *writ denied*, 801 So. 2d

---

[4](...continued)

> parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.

LA. CIV. CODE ART. 3542.

375 (2001), the court has no need to -- the substantive law for Sage's counterclaims is the same for both states.  *See generally* Sage Response at 10 n.39 (comparing the elements of breach of contract, fraud,[5] money had and received,[6] and unjust

---

[5]      Under Texas law, the elements of a fraud claim are:  (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.  *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).  Under Louisiana law, two elements are required:  "(1) an intent to defraud and (2) actual or potential loss or damage" as well as another element, whether it be "labeled reliance, inducement, or causation."  *Sun Drilling Products Corporation v. Rayborn*, 798 So. 2d 1141, 1152-53 (La. App. 4 Cir. 2001), *writ denied*, 807 So. 2d 840 (2002).

[6]      The claim for money had and received does not differ significantly between Louisiana and Texas substantive law.  See *Nebraska Beef, Ltd. v. KBK Financial, Inc.*, No. 4:03-CV-1486, 2006 WL 538790, at *6 n.9 (N.D. Tex. Mar. 3, 2006) ("If a defendant is found to hold money that rightfully belongs to the plaintiff, a contract will be implied by law under which the defendant is obligated to return the money to the plaintiff.  Therefore, the sole inquiry for a court deciding a money had and received claim is whether the defendant holds money that, in equity and good conscience, belongs to the plaintiff." (citing *Amoco Production Company v. Smith*, 946 S.W.2d 162, 164 (Tex. App. -- El Paso 1997, no writ)); *Kramer v. Freeman*, 198 La. 244, 254-55 (La. 1941) (describing an action in which "the defendants had sold or otherwise disposed of [the plaintiff's] property, [then the plaintiff] could have prayed only for judgment against [the defendants] for the price they received for it" as one being for money had and received, authorized under LA. CIV. CODE ART. 2313, revised as LA. CIV. CODE ART. 2305 ("A person who in good faith alienated a thing not owed to him is only bound to restore whatever he obtained from the alienation.  If he received the thing in bad faith, he owes, in addition, damages to the person to whom restoration is due.")).

enrichment[7] for Texas and Louisiana and finding no difference between the two).

Sage argues that, because a choice-of-law determination is unnecessary, Berg's motion

to apply Louisiana law to Sage's counterclaims should be denied.  *Id*. at 9-10.  Sage

cannot have it both ways, though; because the states' laws do not differ, the law of

the forum state should apply.  See *Schneider*, 280 F.3d at 536.  Accordingly, Louisiana

law -- the law of the forum state from which the case was transferred to this court

under § 1404(a) -- will be applied to Sage's counterclaims.

B.  Evidentiary Burdens on Motion for Summary Judgment

Summary judgment is proper when the pleadings and evidence before the court

show that no genuine issue exists as to any material fact and that the moving party is

entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); see also *Celotex*

*Corporation v. Catrett*, 477 U.S. 317, 323 (1986).  The disposition of a case through

summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy,

and inexpensive determination of actions, and, when appropriate, affords a merciful

---

[7]        Similarly, there is no difference in the substantive law between
Louisiana and Texas for the claim of unjust enrichment.  See *Burlington Northern*
*Railroad Company v. Southwestern Electric Power Company*, 925 S.W.2d 92, 96 (Tex.
App. -- Texarkana 1996) (stating that "[w]hen a defendant has been unjustly
enriched by the receipt of benefits in a manner not governed by contract, the law
implies a contractual obligation upon the defendant to restore the benefits to the
plaintiff"), *aff'd*, 966 S.W.2d 467 (Tex. 1998); *Gulfstream Services, Inc. v. Hot Energy*
*Services, Inc.*, 907 So. 2d 96, 101 (La. App. 1 Cir.) ("To prove a case of enrichment
without cause, the plaintiff must demonstrate:  (1) an enrichment; (2) an
impoverishment; (3) a connection between the enrichment and impoverishment;
(4) the absence of justification or cause for the enrichment and impoverishment; and,
(5) the lack of any other remedy at law"), *writ denied*, 904 So. 2d 706 (2005).

end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).  Nonetheless, summary judgment is a drastic remedy that should be used cautiously.  *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980).

While all of the evidence must be viewed in a light most favorable to the nonmovant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the nonmovant's summary judgment burden.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (citing *Little v. Liquid Air Corporation*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The movant makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues.  *Celotex*, 477 U.S. at 323; *Lindsey v. Sears Roebuck and Company*, 16 F.3d 616, 618 (5th Cir. 1994) ("When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial."); *Fontenot*, 780 F.2d at 1194 ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative

- 12 -

defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.") (emphasis in original).[8]  The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists.  FED. R. CIV. P. 56(c).

If the movant makes the showing, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.  To carry this burden, the "opponent must do more than simply show . . . some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  Instead, the nonmovant must show that the evidence is sufficient to support a resolution of the factual issue in its favor.  *Anderson*, 477 U.S. at 249.  The nonmovant cannot survive a motion for summary judgment by merely resting on the allegations in its pleadings.  *Isquith for and on behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988); see also *Celotex*, 477 U.S. at 324.

---

[8]     Berg, as the movant for partial summary judgment, is also the party with the burden of proof at trial.  His burden on his motion for partial summary judgment, therefore, consists of more than simply pointing out deficiencies in his opponent's case; instead, he must establish his right to relief as a matter of law.  Similarly, because Sage bears the burden of proving its counterclaims against Berg, Sage must establish its right to relief on those claims.

C.  Berg's and Sage's Cross-Motions for Partial Summary Judgment

1.  *Berg's Claims Against Sage*

Sage has moved for summary judgment on all claims against it.  Defendant Sage Environmental Consulting of Austin, Inc.'s Brief in Support of Motion for Partial Summary Judgment ("Sage Motion") at 1.

a.  $150,000 Signing Bonus

One of the first claims against Sage involves the $150,000 unpaid signing bonus orally promised to Berg, the circumstances of which differ depending on which party is describing the agreement.  First Amended Complaint ¶ 5.  Without stipulating to the truth of the assertion, Sage assumes in its motion for summary judgment that Probst orally promised Berg that he would receive $150,000 "strictly for agreeing to leave the partnership at ERM and to come and work for Sage," but that these monies would be structured as a real estate transaction.  Sage Motion at 2 and n.2.  Based on this unwritten agreement, Sage requests summary judgment -- on multiple grounds -- on this claim.  *See generally id*. at 1-16.

i.  Statute of Frauds

Sage first argues that such an unwritten agreement structured around the transfer of real estate automatically triggers the Statute of Frauds and, because Berg cannot point to any written document referencing this deal, Berg's claim for this money is barred.  Sage Motion at 5.

Under either Texas or Louisiana law, contracts involving real estate must be in writing. *Palmer v. Fuqua*, 641 F.2d 1146, 1158 (5th Cir. 1981) (applying Texas law); *Salem v. Maise*, 449 So. 2d 121, 124 (La. App. 4 Cir. 1984); see also *Scott v. Ducasse*, 622 So. 2d 724, 726 (La. App. 5 Cir. 1993) (citing LA CIV. CODE ART. 2440 for the proposition that the sale of immovable property must be in writing). Assuming -- as Sage in fact does -- that Probst made an oral promise to Berg that he would receive $150,000 structured as a real estate transaction and this transaction remained intentionally unwritten, it appears to the court that such an agreement would in fact be barred by the Statute of Frauds. However, Berg makes the argument that the oral promise made to him was that he would receive $150,000; the form of the compensation was a separate issue for the purpose of tax advantages. Berg Response at 2. If true, this would take the promise to deliver $150,000 out of the Statute of Frauds provision dealing with real estate; the promise to structure the receipt of funds through a real estate transaction would be unenforceable as there is no writing referencing such agreement, but the oral promise to give Berg a "signing bonus" would possibly be enforceable.[9]

------------------------------------------------------------

[9]   The court notes two cases cited by Sage to support its argument that "the underlying purpose of the compensation is irrelevant for the application of the Statute of Frauds; rather the only relevant inquiry is whether the transaction involves a transfer of real estate." Defendant Sage Environmental Consulting of Austin, Inc.'s Reply to Plaintiff's Response to Sage's Motion for Partial Summary Judgment ("Sage Reply") at 5 (citing *Miller v. Graves*, 185 S.W.2d 745, 748 (Tex. Civ. App. 1945, writ ref'd); *Scott v. Ducasse*, 622 So. 2d 724 (La. App. 5 Cir. 1993)). The court has read

(continued...)

This leads to the next issue: whether another provision of the Louisiana Statute of Frauds would bar Berg's recovery of $150,000. Louisiana law requires that, in order to recover on an oral promise worth over $500, a claimant must prove the contract by at least one witness -- who may be the plaintiff -- and other corroborating circumstances.[10] See *Peter Vicari General Contractor, Inc. v. St. Pierre*, 831 So. 2d 296, 301 (La. App. 5 Cir. 2002) (noting that only general corroboration is required and "[i]t is not necessary that plaintiff offer independent proof of every detail."). As articulated in his response, Berg meets this criteria: he relies upon the testimony of three witnesses and other corroborating circumstances. *See* Berg Response at 2, 3-9

---

[9](...continued)
these cases and determines that, although each case held that oral agreements creating interests in land remain within the purview of the Statute of Frauds, they are distinguishable from this case. As stated above, the structured transaction may be covered by the statute of frauds, but the oral promise for a signing bonus consisting of $150,000 is arguably a separate agreement.

[10]      Article 1846, the provision regarding proof of obligations, provides:

> When a writing is not required by law, a
> contract not reduced to writing, for a price or,
> in the absence of a price, for a value not in
> excess of five hundred dollars may be proved
> by competent evidence.
>
> If the price or value is in excess of five
> hundred dollars, the contract must be proved
> by at least one witness and other
> corroborating circumstances.

LA. CIV. CODE ART. 1846.

(discussing Berg's version of the negotiations and oral promises regarding his

$150,000 signing bonus).  Considering Berg's version of the facts, Sage's offer letter

stating that "Sage will also assist with the acquisition or provision of facilities for

client entertainment and business retreats" takes on special significance.  Exhibit B-15

at 1, *attached to* Defendant's Appendix of Evidence in Support of its Motion for

Partial Summary Judgment *at* 385-86.[11]  Consequently, Sage's motion for summary,

on the ground that the $150,000 signing bonus claim is barred by the Statute of

Frauds, must be denied.[12]

---

[11]     For ease of reference, the court will refer to all citations from this appendix by its exhibit number and page number therein (*e.g.*, "Exhibit B-15 at 1").

[12]     The court notes another reason for denying summary judgment on Statute of Frauds grounds: there still exits a genuine issue of material fact regarding the actual promise made to Berg.  Berg contends that it was specifically a promise of $150,000 for leaving ERM and accepting a position at Sage, while it appears to the court that Sage is arguing that the promise was solely to transfer $150,000 via a real estate transaction.  The substance of the promise affects Berg's ability to recover.

In addition, although contained within its discussion of detrimental reliance, Sage contends that because Berg has not made a claim for out-of-pocket damages as a result of his reliance on Sage's promises, Berg's claim for his $150,000 signing bonus is barred.  Sage Motion at 13.  Arguing under Texas law, Sage asserts that "the Statute of Frauds bars a fraud claim to the extent the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the Statute of Frauds." *Id*. at 14 (quoting *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001)).  As stated above, though, the agreement as described by Berg does not fall within the Statute of Frauds.  Accordingly, this argument is inapplicable.

ii.  Detrimental Reliance

Sage next argues that Berg's reliance on detrimental reliance or promissory estoppel is faulty because such doctrines are not applicable to any aspect of the lawsuit.  Sage Motion at 11.  Citing a recent Louisiana decision, Sage argues that it was held "unreasonable as a matter of law to rely on an offer of at-will employment." *Id*. at 12 (citing *May v. Harris Management Corporation*, 928 So. 2d 140 (La. App. 1 Cir. 2005)).  Berg, on the other hand, contends that his claims for detrimental reliance are not based on promises of permanent employment; rather, he argues that he reasonably relied on promises regarding his $150,000 signing bonus.  Berg Response at 10.

To recover under a theory of detrimental reliance, a plaintiff must show the existence of (1) a representation or promise; (2) justifiable reliance on the representation or promise; and (3) a change in position to the detriment of the plaintiff because of the reliance.  *Hughes v. Muckelroy*, 700 So. 2d 995, 1001 (La. App. 1 Cir. 1997); *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983).  In addition, under Louisiana law, "[e]stoppel, because it bars the normal assertion of rights, is not favored . . . and is used sparingly." *Leger v. Tyson Foods, Inc.*, 670 So. 2d 397, 402 (La. App. 3 Cir.) (quoting *Thebner v. Xerox Corporation*, 480 So. 2d 454 (La. App. 3 Cir. 1985), *writ denied*, 484 So. 2d 139 (La. 1986)), *writ denied*, 671 So. 2d 920 (La. 1996).

On the sole issue of whether summary judgment should be granted to Sage on
Berg's claim that he detrimentally relied on Sage's promise of a $150,000 signing
bonus, summary judgment is denied.  Sage has conceded, for the purpose of its
summary judgment motion, that Probst made a promise of $150,000 to Berg, so the
first element of detrimental reliance is met.  For the second element, the court cannot
say, as a matter of law, that Berg's reliance on Sage's promise was unreasonable;
assuming Berg's version of the events -- as the court must do on a motion for
summary judgment -- Berg was relying on a promise of $150,000 to resign from ERM
and accept with Sage, rather than relying on Sage's offer of employment for any
length of time.  Berg was not relying on any at-will employment with Sage at all -- he
was simply leaving his former employer for the promise of $150,000.  See, *e.g.*, *Arby's
Inc. v. Cooper*, 444 S.E.2d 374, 375 (Ga. App. 1994) (holding that a terminable at-will
employee may recover unpaid bonuses which are based on oral promises), *rev'd on
other grounds*, 454 S.E.2d 488 (1995) (reversing appellate court decision because the
oral contract did not definitively and objectively calculate the amount of annual
bonus); *Livernois v. Medical Disposables, Inc.*, 837 F.2d 1018, 1022-23 (11th Cir. 1988)
(applying Georgia law, noting that at-will employee was not claiming damages for
wrongful termination, but for breach of contract because the employer had failed to
compensate him with benefits accrued prior to his discharge);[13] *Daisley v. Riggs Bank,*

---

[13]     Given the dearth of law on the subject in the relevant jurisdictions, the
(continued...)

*N.A.*, 372 F. Supp. 2d 61, 70 (D.D.C. 2005) ("Notwithstanding an at-will employment agreement, an employee and employer may still contract regarding other terms, such as bonuses or stock options.").  The $150,000 bonus -- the amount definitively stated -- was earned by Berg through his resignation from ERM and subsequent acceptance with Sage.  As for the third and final element of detrimental reliance -- a change in position to the detriment of Berg -- genuine issues of material fact abound.  Sage asserts, based on Berg's 2003 mediation statement, that Berg would have left ERM anyway, Sage Motion at 16-18, while Berg maintains that it was Sage's representations regarding compensation and indemnity that induced him to resign and accept with Sage.  *Id*. at 18 (citing Berg's deposition testimony in which he stated he "would not have gone to work for Sage if they had attached strings similar to what [other employers] attached").  Such damage is a required element of detrimental reliance; without pointing out a lack of evidence on the part of Berg, Sage's motion for summary judgment on this claim must be denied.

---

[13](...continued)
court has been forced to look to other jurisdictions for guidance.  Finding the Georgia courts' rationale convincing, the court adopts it in this memorandum opinion and order.  Moreover, the court notes that *May*, 928 So. 2d 140, is distinguishable from the instant case.  Not only did that court specifically note that the defendant did not give additional consideration for the plaintiff's resignation and acceptance of its offer, *May*, 928 So. 2d at 146, but the plaintiff never began employment at the defendant's place of business.  Here, Sage promised $150,000 for Berg's resignation and acceptance and Berg completed almost one year of employment.  *May* decided the reasonability of a mere offer of at-will employment, with no additional consideration, not the issue of an oral promise to pay a signing bonus to leave a current employer.

Sage submits another argument supporting summary judgment on Berg's detrimental reliance claim. Specifically, arguing under both Texas and Louisiana law, Sage contends that "when a plaintiff asserts a cause of action for promissory estoppel, it is limited to only its out-of-pocket reliance damages." Sage Motion at 15 (citing *Sun Oil Company (Delaware) v. Madeley*, 626 S.W.2d 726, 734 (Tex. 1981); LA. CIV. CODE ART. 1967). Berg responds, saying that "[t]he $150,000.00 signing bonus promised is Berg's measure of damages, not the value of an employment at will relationship." Berg Response at 13.

Louisiana law provides that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery *may* be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise." LA. CIV. CODE ART. 1967 (emphasis added). This statute expressly states that damages *may* be limited; it does not, however, state that only out-of-pocket damages are recoverable, and if not pled, summary judgment is required. *See* LA CIV. CODE ART. 1967, comment (e) ("the court *may* grant damages, rather than specific performance, to the disappointed promisee" (emphasis added)); 18 Louisiana Civil Law Treatise, Civil Jury Instructions § 19.08 (2d ed.) ("Louisiana law permits a plaintiff to recover damages which result from his change of position, which damages may be limited to the expenses that he incurred or the damages which

he suffered as a result of his reliance."). Berg has stated that he suffered damage --

assuming a jury finds in his favor, he must then show the amount of damages

suffered. Rather than necessitating summary judgment, such an issue is available for

determination if/when damages are calculated.[14]

Because there exist material facts for trial and Berg may have a claim for

detrimental reliance, summary judgment is denied on this claim.

b. Indemnification for Legal Fees Incurred in ERM Litigation

Sage's next argument is that summary judgment should be granted on Berg's

claim for indemnity. *See generally* Sage Motion at 19-36. Berg responds that his

"primary claim" is "based upon the oral agreement reached between Berg and Sage

wherein Sage contractually agreed to indemnify Berg" and since Sage "fails entirely to

address [this] claim," summary judgment should be denied. Berg Response at 13. . .

i. Indemnification Under the Texas Business Corporation Act

---

[14]        Here, the difference between Louisiana and Texas law enters into the
discussion. As mentioned above, Louisiana allows the court to award only reliance
damages rather than benefit-of-the-bargain damages; this, however, is not required.
In fact, in other jurisdictions, the consideration itself is recoverable. *See generally* 4
AMERICAN JURISPRUDENCE PROOF OF FACTS 2D 641: Detrimental Reliance on
Promise § 8 ("Some courts have adopted [that] the measure of damages . . . should be
such as to place the promisee so far as possible, in as good a position as that which he
would have occupied had the promisor performed . . ."). Under Texas law, damages
for promissory estoppel/detrimental reliance are "limited to the amount necessary to
compensate that party for a loss already suffered." *Sun Oil Company*, 626 S.W.2d at
734. Without deciding the applicable law, summary judgment must nevertheless be
denied. Assuming Berg proves a sufficient case of detrimental reliance, the choice-of-
law issue can be settled at that time for a determination of the amount of recoverable
damages.

Article 9 of Sage's articles of incorporation read as follows:

> Any office [sic], director, or employee who is entitled to indemnification from the Corporation may make a written demand to the Board of Directors by serving the written demand on the President or the Secretary . . ..  If the Board of Directors does not, within fifteen (15) days after service of the written demand, determine that the officer, director, or employee is entitled to indemnification, the officer, director, or employee may, withing [sic] sixty (60) days following the date of service of the demand, apply to a court of general jurisdiction in the county where the Corporation maintains its principle [sic] office to consider whether or not the officer, director, or employee has met the standards set forth in the Bylaws of the Corporation as to the permissibility of indemnification.

Exhibit B-21 at 2.

Because Sage is a Texas corporation, indemnity claimed through its articles of incorporation is governed by the Texas Business Corporation Act ("TBCA").  Sage bases most of its arguments on this statutory scheme.  According to the TBCA, "[a] corporation may indemnify and advance expenses to persons who are not or were not officers . . . to the same extent that it may indemnify and advance expenses to directors under this article."  Tex. Bus. Corp. Act, Art 2.02-1, sec. P.  Starting from this statute, Sage analyzes its own Articles of Incorporation and determines that Berg's demand for indemnification was inadequate.  Sage Motion at 20-23.

Berg has failed to point to any reason why summary judgment should not be granted in Sage's favor on this claim; rather, Berg simply argues that Sage did not address his "primary claim" of contractual indemnification.  Berg Response at 13. Merely "resting on the allegations in his pleadings,"  Berg has failed to withstand his

- 23 -

burden of pointing to genuine issues of material fact or that he may succeed on this claim.  Accordingly, summary judgment is granted to Sage on Berg's claim for indemnification under the TBCA.

ii.  Indemnification via Detrimental Reliance

As another basis for indemnification, Berg utilizes the same argument as above regarding his $150,000 bonus:  *viz.*, that Sage orally promised to indemnify him if he were sued by ERM for defecting and joining Sage.  Berg Response at 14 (noting that the two corroborating witnesses are Berg and his attorney, Timothy Gunn).  Addressing this argument, Sage replies that Berg's "only requests for indemnity were both made pursuant to the Articles of Incorporation."  Berg, however, made a claim for indemnity in his complaint pursuant to an agreement with Sage and, alternatively, detrimental reliance.  *See* First Amended Complaint ¶ 15 ("Pursuant to the agreement reached with Sage relative to his employment, Berg is entitled to recover his attorneys' fees and defense costs incurred in the defense of the lawsuit filed by ERM. . . .  Alternatively, Berg is entitled to recover such attorneys' fees and litigation expenses on the basis of his detrimental reliance and/or promissory estoppel upon Sage's representations, promises and agreements in terminating his employment with ERM and acceptance of employment with Sage.").  Sage responds that not only does Berg's claim fail because he cannot detrimentally rely on at-will employment, Sage

Motion at 10, but also because such an oral promise cannot exist as an independent

claim.  *Id*. at 10-11.

An agreement to indemnify is enforceable as independent from a statutory

indemnification claim.  See *American Hallmark Insurance Company of Texas v. Lyde*, No.

05-97-01611-CV, 2000 WL 1702597, at *2-6 (Tex. App.--Dallas Nov. 15, 2000, pet.

denied) (not designated for publication) (analyzing and enforcing contractual

obligation to indemnify separate from indemnification claim under the TBCA).  As an

equitable doctrine, "[i]ndemnity . . . may be recovered if the evidence establishes an

implied contract or if one party is exposed to liability by the action of another party

who, in law or in equity, should make good on the loss of the other."  *Grinnell Mutual*

*Reinsurance Company v. Center Mutual Insurance Company*, 658 N.W.2d 363, 378 (N.D.

2003).  According to Berg, Probst promised that Sage would indemnify Berg for any

litigation expenses incurred from Berg's departure from ERM and joining Sage.  Berg

Response at 13-14.  Because of Probst's statement, Berg detrimentally relied on his

promise and subsequently resigned from ERM, thereby exposing him to possible

litigation.  *Id*. at 15 ("What person in their right senses would commit himself to

incur attorney fees to benefit a prospective employer (in which the employee owned

no equity stake), without an agreement from the employer to reimburse the legal

expenses?").  Similar to the analysis above regarding his bonus, fact issues permeate

this claim; if Berg is able to prove the agreement using witnesses and corroborating

circumstances, Sage may be obligated to indemnify him.  Additionally, for the same

reasons that Sage's promise to pay Berg the $150,000 bonus is arguably separate

from a promise for at-will employment, so is Sage's promise to indemnify Berg for

ERM litigation arguably independent of Sage's promise of at-will employment.

Moreover, even if the court were to hold that Sage's promise had to come

within the provisions of the TBCA to be enforced -- independent of whether Berg

properly demanded indemnity under the statute -- genuine issues of material fact

preclude granting summary judgment.  It cannot be said with certainty whether Berg

acted in bad faith when departing ERM and joining Sage; if he did, Sage's promise to

Berg would be barred by the provisions of the TBCA which preclude indemnification

if the employee's wrongful conduct was not undertaken for the corporation's best

interests.  In addition, although Sage argues that Berg was sued in his own capacity,

rather than "by reason of the fact" that he was an employee of Sage, the fact remains

that ERM's suit against Berg avers that "Berg used or disclosed confidential and

proprietary information of ERM on behalf of his new employer."  Exhibit B-11 at 5.

It is by virtue of Berg's employment with Sage that Berg allegedly disclosed

"information useful to Sage in recruiting employees of ERM to leave ERM's

employment and join Sage."  *Id*.  Although Sage argues that the suit was based solely

on Berg's pre-resignation conduct, the fact remains that several ERM employees left

that company to join Sage *after* Berg was hired.  Berg Motion at 19-20 (noting that

two employees resigned their positions at ERM to accept positions at Sage the same day as Berg, while another five ERM employees resigned a week later to join Sage). Sage makes much of the case *In re Miller*, 290 F.3d 263 (5th Cir. 2002), in which the court held that the new employer did not need to indemnify the new employee because was not sued "by reason of the fact" that he was an officer and employee of new employer. Sage Motion at 23-32. This case is distinguishable, though. Not only was the Fifth Circuit interpreting articles of incorporation under Delaware law which *required* the corporation -- via different language -- to indemnify its officers for official activity, but it was upholding a decision in which the defecting employee stole boxes of confidential documents in order to persuade the new employer of the benefits of hiring him and competing in Texas. *In re Miller*, 290 F.3d at 266-69. Here, Sage's arguments regarding its care in protecting itself from Berg's allegedly wrongful conduct fall flat -- Sage actually hired those employees following Berg after his departure from ERM and was therefore benefitted by such conduct. It remains for a jury to determine whether Berg's activities fall within the TBCA and are therefore subject to indemnification or were part of a reliable promise of Probst to Berg. Summary judgment is denied.[15]

---

[15]      The court notes that Sage wishes to deny Berg attorneys' fees for two declaratory judgment actions filed in Louisiana. Sage argues that because Berg was a named plaintiff rather than a named defendant, neither Sage's Articles of Incorporation nor the TBCA provide for indemnification. Sage Motion at 36. Independent of whether these provisions *permit* indemnification in these

(continued...)

c.  $75,000 Deferred Compensation

Sage also requests summary judgment on Berg's claim for $75,000 of deferred compensation.  *See generally* Sage Motion at 40-43.  Basing its argument on Berg's at-will employment status, Sage argues that Sage had the unilateral right to change, modify, or reduce Berg's compensation at any time for any reason.  *Id*. at 40.  Because Berg continued working after this reduction, "he has accepted the changes as a matter of law."  *Id*. (quoting *In re Halliburton Co.*, 80 S.W.3d 566, 568 (Tex. 2002)).  Additionally, Sage contends that because Berg voluntarily resigned, Louisiana law makes clear that he cannot recover any portion of deferred compensation.  *Id*. at 41-42 (citing and quoting *Morse v. J. Ray McDermott & Company*, 344 So. 2d 1353 (La. 1977)).  Finally, Sage states that Berg's deferred compensation was reduced in accordance with the explicit terms of Sage's 401(k) Profit Sharing Plan.  *Id*. at 42-43.

Berg responds, stating that his deferred compensation was independent of Sage's 401(k) Plan.  Berg Response at 25.  In addition, Sage "retroactively denied Berg deferred compensation clearly accrued to him through the date the change in his compensation was effected."  *Id*.

---

[15](...continued)
circumstances (rather than specifically mentioning such instances), if Sage's promise to Berg was that he would be indemnified in *any* litigation involving ERM, such an agreement could be enforced.  Moreover, since Sage was a named plaintiff in one of the actions, *see* Exhibit B-28, Sage cannot now claim to have no part in this action despite being an obviously interested party.

- 28 -

Genuine issues of material fact preclude summary judgment on this issue.  The specific language of the offer letter (either version) states:

> Additionally, deferred compensation will be accrued at the annual rate of $75,000.00.  You *will also be eligible for corporate profit sharing* and other bonus compensation.  As a full-time employee, you are eligible to participate in the following: . . .  A range of other company benefit options . . ., including a group health plan and 401(k) program (with 50% matching of the first 10% contribution).

Exhibit B-15 at 1(emphasis added).  By virtue of Sage's self-chosen title for the plan ("Sage Environmental Consulting, Inc. 401(k) *Profit Sharing Plan*" (emphasis added)), Exhibit B-31, it appears that the offer letter's promise of *additional* eligibility in the plan is separate from the promise of $75,000 deferred compensation.  This language, in combination with Probst's deposition, makes it unclear whether the $75,000 deferred compensation was to be included within the 401(k) Plan.  If within the plan, voluntary resignation *may* preclude vesting; if outside the plan, employment as of the end of the year has no bearing.  See *Morse*, 344 So. 2d at 1369-71 (upholding retirement plan's non-vesting clause because the specific terms of the plan inform the employee precisely that he has not "earned" anything prior to his vesting date).  If not within the plan, a jury must determine the substance of the agreement regarding the $75,000 deferred compensation offered by Sage in Berg's letter (*e.g.*, any possible

vesting dates, right to reduce compensation, rights to pro rata compensation, *etc.*).

Summary judgment is denied.[16]

### d.  Vacation Pay, Sick Pay, and Holiday Pay

Sage next argues that summary judgment should be granted on Berg's claim for

unused vacation, sick, and holiday pay.  *See generally* Sage Motion at 36-40.  First,

Sage argues that its policy provides for payout of unused vacation time for employees

with one year of employment.  Because Berg voluntarily resigned prior to his one-year

anniversary, Sage maintains, he is not entitled to his vacation pay.  *Id*. at 36-38.

Next, Sage contends that because its uniform policy is not to pay unused sick time for

any employee upon termination of employment, Sage does not owe Berg any sick

pay.  *Id*. at 38-39.  Finally, because holiday pay is not a "wage" under Louisiana

statutes, Sage argues, summary judgment should be granted on this claim.  *Id*. at 39-

40.

To "compel prompt payment of *wages* upon an employee's discharge or

resignation," *Boudreaux v. Hamilton Medical Group, Inc.*, 644 So. 2d 619, 621 (La.

1994) (emphasis in original), Louisiana enacted statutes 23:631,[17] 23:632,[18] and

---

[16]     The court will not determine the legality of the profit sharing plan at
this time.  If the $75,000 is found to be within the plan's purview, the court will look
to whether the plan is lawful under the Louisiana provisions against wage forfeiture.
*See* Section II.C.1.d.-f., *infra*.

[17]     The relevant provision of 23:631(A)(1)(b) provides:

(continued...)

- 30 -

23:634.[19]  These statutes provide the general policy that, upon termination of

---

[17](...continued)

> Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.

LA. REV. STAT. 23:631(A)(1)(b).

[18]      23:632 provides:

> Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.

LA. REV. STAT. 23:632.

employment, an employer will pay any accrued wages due to the employee.  It is not contested that vacation time constitutes "wages" under the Louisiana statutes.  Sage Reply at 13.  Berg argues that not only is Sage's policy an unlawful forfeiture of his accrued vacation pay, Berg Response at 22, but also that Sage's written policy was not uniformly applied.  *Id*. at 24.

Louisiana law holds that a vacation policy which forces the employee to forfeit vacation pay upon leaving the employer is unlawful.  See *Beard v. Summit Institute of Pulmonary Medicine and Rehabilitation, Inc.*, 707 So. 2d 1233, 1236 (La. 1998).  Sage's employee handbook provides, "[u]pon termination of employment for any reason, an employee who has completed one year of service will be paid for any vacation accrued but not taken, unless special arrangements are made."  Exhibit B-14 at 4-1.  This

---

[19]      Finally, the provision making forfeiture of wages unlawful states:

> A.      No person, acting either for himself or as agent or otherwise, shall require any of his employees to sign contracts by which the employees shall forfeit their wages if discharged before the contract is completed or if the employees resign their employment before the contract is completed; but in all such cases the employees shall be entitled to the wages actually earned up to the time of their discharge or resignation.

LA. REV. STAT. 23:634(A).

- 32 -

provision goes on to state, "[a]fter one (1) year of eligible service the employee will accrue up to ten (10) vacation days per year, accrued weekly at the rate of 1.60 hours for each full week of service completed." *Id*. Berg's offer letter, however, provides that he will receive "[t]wenty (20) vacation days per year (prorated from your date of hire)." Exhibit B-15 at 1.  The employee handbook is very specific: *after* one year of service, vacation days are accrued weekly.  It is uncontested that Berg did not complete one year of service.

A complication arises, though, because Berg argues that Sage's policy was not consistently applied.  Berg Response at 24.  Without providing specific citations to the record, Berg avers that "at least two who were terminated prior to the completion of one year of service were paid their accrued vacation leave at the time of termination of employment." *Id*.  Despite much effort, the court has been unable to locate these instances.  The only discussion pertaining to vacation time payouts involved Muller stating that only two employees received vacation pay, and these employees worked longer than one year. *See* Exhibit B-5 at 225 (noting that "both Randi [Wyatt] and Omer [Wolff] worked more than a year and were paid their vacation").  These statements clearly do not support Berg's assertion.  Berg advances additional arguments, though:  he took vacation time during his first year of employment, Muller stated in his deposition that Berg's vacation days accrued ratably, and Sage's employment records detail the amount of Berg's vacation time

- 33 -

accrued, used, and remaining.  Berg Response at 22 (citing Muller Deposition at 53,

55-56, *attached to* Plaintiff's Appendix to Memorandum in Opposition to Motion for

Partial Summary Judgment Filed by Defendant ("Berg Response Appendix")

(Appendix page 224, 225-26); Probst Exhibit 15, *attached to* Berg Response Appendix

*at* 215).  Although Sage's employee handbook says nothing about employees being

prohibited from using vacation during their first year of employment, these

arguments clearly indicate an accrual of vacation time during the first year.  In

addition, Berg's offer letter evidences an exception to the rule: he would receive 20

vacation days per year, starting from the date of hire.  The question then becomes

whether Sage's policy -- and possibly inconsistent application -- is an unlawful

forfeiture of vacation pay.

　　　As stated above, Louisiana law generally provides that accrued vacation pay is

wages under LA. REV. STAT. 23:631.  *Beard*, 707 So. 2d at 1235.  Because Louisiana

law does not permit an employer to require an employee to forfeit wages, *see* LA. REV.

STAT. 23:634, an "employment policy that requires the forfeiture of accrued but

unused vacation time is illegal."  *Aguillard v. Crowley Garment Manufacturing Company*,

824 So. 2d 347, 351 (La. App. 3 Cir.) (citing *Beard*, 707 So. 2d at 1235), *writ denied*,

823 So. 2d 955 (2002).  "Accrued" means "vested."  *Id*. (quoting *Winkle v. Advance

Products and Systems*, 721 So. 2d 983, 986 (La. App. 3 Cir. 1998).  "A vested right is

defined as that case when 'the right to enjoyment, present or prospective, has become

the property of some particular person or persons as a present interest.  The right must be absolute, complete and unconditional, independent of a contingency, and a mere expectancy of future benefit . . . does not constitute a vested right."  *Id*. at 351-52 (quoting *Berteau v. Wiener Corporation*, 362 So. 2d 806, 808-09 (La. App. 4 Cir.), *writ denied*, 365 So. 2d 242 (La. 1978)).

Here, Sage's employee handbook states, "[u]pon termination of employment for any reason, an employee who has completed one year of service will be paid for any vacation accrued but not taken, unless special arrangements are made."  Exhibit B-14 at 4-1.  As evidenced by Berg's use of 76 hours of vacation time, the right to vacation was not prospective -- he could use accrued time during the first year of employment.  Moreover, even if his vacation time were considered prospective, this fact alone has not defeated recovery of vacation pay.  See *Macrellis v. Southwest Louisiana Independence Center*, 657 So. 2d 135, 137 (La. App. 3 Cir. 1995) (permitting recovery to employees terminated prior to one year of employment although the policy allowed for vacation time only after probation period of one year:  "Although the right to enjoy the annual leave was prospective, it became the property of the employee as it was earned during the first year of employment.  Thus the earned annual leave was an 'amount then due' under La. R.S. 23:631(A)." (emphasis removed));[20] *Evans v. Manville Products Corporation*, 505 So. 2d 924, 927 (La. App. 2

---

[20]      The employee policy in *Macrellis* stated that annual leave is accumulated
(continued...)

Cir.), *writ denied*, 508 So. 2d 824 (La. 1987), *cert. denied*, 484 U.S. 1004 (1988);[21]

*Picard v. Vermilion Parish School Board*, 742 So. 2d 589, 595-96 (La. App. 3 Cir.) ("We

now hold that in the absence of a clear, written policy establishing that vacation time

granted by an employer to an employee is nothing more than a mere gratuity and not

to be considered an amount due or a wage, accrued but unused vacation time is a

vested right for which an employee must be compensated upon discharge or

resignation."), *writ denied*, 749 So. 2d 675 (1999); *Aguillard*, 824 So. 2d at 353

(finding that since the policy provides that vacation is earned based on the

employee's length of service and is tied to the employee's performance at work,

employees are entitled to compensation); cf. *Huddleston v. Dillard Department Stores,*

*Inc.*, 638 So. 2d 383, 384 (La. App. 5 Cir. 1994) (holding that vacation time was not

a vested right because the employee handbook stated specifically "Vacation is a

---

[20](...continued)
based on the number of years worked (*e.g.*, employed 1-5 years = 10 working
days/year) and "[e]mployees on probationary status who are subsequently offered
regular full time employment will be credited with annual leave benefits earned
during their probationary period." *Marcellis*, 657 So. 2d at 136-37.  Based on this
language, the court found that "annual leave was *accumulated* on the basis of years of
employment and was *earned* even during the probationary period." *Id*. at 137
(emphasis in original).

[21]     The vacation provision applicable in *Evans* stated, "All employees who
on January 1 of any year have been continuously employed for one (1) or more years
shall be entitled to vacation with pay subject to the provisions set for this in this
Article."  505 So. 2d at 926.  Therefore, if an employee was discharged in August, he
did not have one year's continuous employment on January 1 when vacation wages
would otherwise accrue.  *Id*.  Based on this language, the court found the policy
illegally required employees to forfeit earned vacation time.

benefit and not an earned wage.  'Accrued Vacation' is *only* considered an earned

benefit, and payable upon termination, if the employee terminates due to death,

retirement, or *voluntarily* terminates employment.").  Given Louisiana's strong policy

against forfeiture of wages, *Morse*, 344 So. 2d at 1359 n.10, the court cannot say that

Sage's policy is lawful.  Sage's application of the policy to Berg -- and possibly other

employees as well -- indicates that his vacation time could be used during the first

year of employment.  Despite the specific language of the employee handbook, Sage's

records detailed ratably accrued and used vacation time during his first year.  This

suggests that Berg had a vested right in his vacation time; therefore Sage's policy of

refusing to pay out such accrued time if an employee did not work an entire year

would be considered a forfeiture of wages and thus unlawful under LA. REV. STAT.

23:634.

Summary judgment on this claim must be denied on another basis as well.

Despite the employee handbook's language, Sage's vacation records credit Berg with

accrued vacation time during his first year of employment.  He had already used 76

hours of vacation and received a written exception in his offer letter regarding the

amount of vacation permitted by the handbook.  If he was outside the employment

handbook in that instance, there is a possibility that there were also "special

arrangements" made regarding accrued vacation time.  Genuine issues of material fact

exist -- both regarding uniform application of the company policy and the policy itself
-- so summary judgment must be denied.

Regarding his claim for sick pay and holiday time, Berg devotes very little space
to the argument, *see* Berg Response at 25 ("Sage is not entitled to summary judgment
on Berg's claim for accrued holiday pay given that the June 19, 2003 Offer Letter
(both versions), provided that Berg would have 'seven (7) holidays per year (holidays
of your choice) prorated from the date of  hire,' and Sage's own records accrued
holiday leave available to him as of the date of his resignation.").  However, the court
will look to the merits of the claim itself to determine whether summary judgment
should be granted.

Regarding holiday pay, the Sage employee handbook states that "[e]ligible
employees will accrue holiday pay benefits at the rate of 1.08 hours per each full week
of service."  Exhibit B-14 at 4-3.  Nowhere does the handbook provide for payment
upon termination.  The court has been unable to find Louisiana case law deciding
whether "holiday pay" is considered "wages" under the state wage statutes.  However,
given Louisiana's strong policy against forfeiture of wages and the *Beard* case in which
the Louisiana Supreme Court found vacation pay to constitute "wages" under the
state statutes, the court finds no reason why such a holding should not be extended to
holiday pay.  See *Picard*, 742 So. 2d at 593 ("If anything, [passage of R.S. 23:640]
indicates that the legislature does consider fringe benefits wages within the meaning

of La. R.S. 23:634." (emphasis removed) (quoting *Morse*, 344 So. 2d at 1359 n.10)).

Because the policy states that holiday pay is accrued through weeks of service to the company and the policy is silent as to how holiday pay will be handled upon termination, the court cannot conclude that Berg's holiday pay is a mere gratuity rather than wages.  See *Aguillard*, 824 So. 2d at 353 (finding that since the employer's vacation policy was silent regarding vacation payout after termination, the court could not conclude that vacation benefits were a mere gratuity rather than wages).

Berg has a vested right in his holiday pay as it was earned through his service to Sage.  See *Picard*, 742 So. 2d at 595 ("[W]here an employment policy provides for the accrual of vacation time upon the completion of a specified amount of work, the policies against forfeiture of wages dictate than an employee's rights vest once the condition precedent, the allotment of work, is completed.").  Accordingly, summary judgment is denied on this claim as well.

Sage's policy for sick leave provides that "[u]nsused sick leave benefits will not be paid to employees upon termination of employment."  Exhibit B-14 at 4-3.  The policy also provides that "[e]ligible employees will accrue sick leave benefits at the rate of .8 hours per each full week of service," *id*. at 4-2, and "[s]ick leave benefits are intended solely to provide income protection in the event of illness or injury, and may not be used for any other absence."  *Id*. at 4-3.  Given the language of the policy, it is clear that sick time accrues as weeks of service are rendered to the employer *and if used*

*in the event of illness or injury*.   Therefore, because Berg has not shown that he was ill or injured, such sick pay has not accrued and -- without deciding whether sick pay constitutes a wage under Louisiana law -- Sage does not owe Berg payment upon his resignation.   See *Tran v. Petroleum Helicopters*, 771 So. 2d 673, 677 (La. App. 3 Cir.) (refusing to address whether sick leave was considered a wage for the purposes of Louisiana wage statutes and denying payment of accrued sick leave on another ground), *writ denied*, 776 So. 2d 463 (2000); *Jackson v. Housing Authority for Parish of St. James*, 926 So. 2d 606, 612 (La. App. 5 Cir. 2006) ("Although the amount of unused sick leave time is accrued from year to year, the employee is not entitled to payment for unused sick leave time when the employee terminates employment . . .. There was no evidence that [the plaintiff] had not been paid for any sick days that she used due to illness."); but see *Keiser v. Catholic Diocese of Shreveport, Inc.*, 880 So. 2d 230, 234 (La. App. 2 Cir. 2004) (because "[t]he only evidence in this sparse record on the issue of sick leave is the teacher's contract, which states that all full-time staff members are entitled to ten days of sick leave with pay per year," the employee was entitled to a pro-rated portion of sick leave under LA. REV. STAT. 23:631, 632, and 634).   Because Berg has not proven that he has a vested right in this benefit, summary judgment is granted.

e.  Penalty Wages

The last of Berg's claims involve a request for penalty wages under the

Louisiana wage statutes.  Sage moves for summary judgment because it had -- and

still has -- a good faith belief that the amount owed Berg is disputed.  *See generally*

Sage Motion at 43-45.

To recover penalty wages, the claimant must show that (1) wages were due and

owing, (2) demand for payment thereof was made where the employee was

customarily paid, and (3) the employer did not pay upon demand.  *Winkle*, 721

So. 2d at 990.  Such a penalty upon employers "must be strictly construed and may

yield to equitable defenses."  *Beard*, 707 So. 2d at 1236.  Therefore if there is "a

good-faith non-arbitrary defense to liability for unpaid wages, *i.e.*, a reasonable basis

for resisting liability," the employer may not be subject to paying penalty wages under

LA. REV. STAT. 23:632.  *Id*.  The Louisiana Supreme Court has held, however, that

"[r]eliance on an unlawful company policy does not constitute a good faith non-

arbitrary defense to liability for unpaid wages."  *Id*. at 1237.  The issue of an

employer's bad faith is an issue of fact.  *Winkle*, 721 So. 2d at 991.

Here, it is not contested that Berg has met the prerequisites for obtaining

penalty wages; instead, Sage argues that there is a bona fide dispute as to the wages

owed and that Berg has proffered no evidence that Sage acted in bad faith.  Sage

Motion at 44-45.  Berg responds that Sage's allegedly inconsistent practice regarding

- 41 -

payout of wages and benefits under its (unlawful) policy is indicative of Sage's bad faith.  Berg Response at 26.  For the same reasons stated above, summary judgment is precluded: genuine issues of material fact exist regarding Sage's application of the policy and possible bad faith.  Sage's motion is denied on this claim as well.

### 2.  *Sage's Counterclaims Against Berg*

Unlike the previous section wherein only Sage moved for summary judgment on Berg's claims, both parties move for summary judgment on Sage's counterclaims. As stated above, these claims are governed by Louisiana law and deal largely with Berg's receipt of $30,000.  In addition, because Sage would bear the burden of proof at trial, if it is to succeed on these claims on summary judgment, it must prove these claims beyond peradventure.

### a.  Breach of Contract, Money Had and Received, Unjust Enrichment[22]

Sage advances two main arguments regarding its counterclaims for the $30,000 given to Berg.  *See generally* Sage Motion at 45-49.  First, because the money was contingent on Berg's completion of one year of employment -- and Berg admittedly resigned voluntarily prior to his one-year anniversary date -- Berg owes Sage the $30,000 in toto, rather than a pro rata portion of the full amount.  *Id*.  Sage argues that Berg had three separate documents detailing the one-year contingency, so Berg had constructive knowledge of this requirement, despite any possible arguments he

---

[22]     Because these claims are closely related, they will be discussed together.

may make to the contrary. *Id*. at 46. In addition, Sage maintains, the full amount is owed; Louisiana law provides that if an employee voluntarily resigns or is discharged for good cause prior to his bonus date, then the full amount of the bonus is not earned. *Id*. at 49. Berg contends in his summary of relevant facts that he signed his acceptance letter without knowing that the offer letter delivered to him on July 4, 2003 was revised from the original June 19, 2003 letter. Berg Motion at 16. Berg contends, however, that even if the bonus is assumed to have been contingent on completion of one year's service, summary judgment should be granted in his favor. Arguing that there was an implied condition in the contract for $30,000 that Sage would not reduce his compensation, Berg contends that he was constructively discharged prior to his anniversary date and therefore could not fulfill his condition of the contract through Sage's misdealings.[23] *Id*. at 38-39.

It is undisputed that Berg was employed for less than one year, Exhibit B-1 at 287, and three documents produced by Berg unambiguously include the one-year contingency provision. *See* Sage Motion at 46 (noting that the revised offer letter ("Sage is also offering a bonus of $30,000 dollars for your acceptance of this

---

[23]     Although Berg claims that the contested $30,000 was a "down payment" on legal fees for imminent ERM litigation, Berg Motion at 4, he never develops this argument. The court will therefore not address it. Moreover, even if Berg were to properly assert this contention with legal support, it must be rejected -- the only evidence of the agreement is that contained in Sage's offer letters, neither of which mentions its use as a "down payment." *See* Exhibits B-15, B-16. Such parol evidence will not be considered. *See* LA. CIV. CODE ART. 1848.

employment offer, paid on the first payroll date after your date of hire, but
contingent upon completion of one year of service."), the check for the $30,000 itself
("Signing bonus for one year of service"), and the check's pay stub ("Bonuses: signing
bonus for one year of service") all note the contingency provision).  Disputes exist
regarding the content of the agreement:  Berg contends he accepted the offer as
contained in the June 19 offer letter (without the one-year provision) while Sage
maintains that Berg accepted a newly-negotiated offer in Houston and the July 3 offer
letter memorialized the terms of this new agreement.  Ultimately, though, this
dispute does not affect the outcome.  Even if it is assumed that Berg did not initially
accept the term of the second offer letter with the one-year contingency, by cashing
the check with this provision on it and then producing all three documents stating
that term of the contract, he assented to this condition.  *Ceco Corporation v. Mid-Gulf
Construction, Inc.*, 396 So. 2d 474, 478 (La. App. 4 Cir. 1981) (citing LA. CIV. CODE
ARTS. 1811, 1816, 1817 and noting that a contract may be assented to impliedly
through actions, or by silence or by inaction); *Dugas v. Modular Quarters, Inc.*, 561
So. 2d 192, 199 (La. App. 3 Cir. 1990) ("The law does not compel people to read or
to inform themselves of the contents of instruments which they may choose to sign,
but it holds them to the consequences.").  By signing the check containing the
one-year provision and subsequently producing these documents in litigation, Berg is
presumed to have consented to the contents of the offer/modification and therefore

must be held to that condition before he can retain the $30,000 signing bonus.

*Dugas*, 561 So. 2d at 199 (holding that, "the plaintiffs are presumed to have consented to [the sale document's] contents and to be bound by the provisions of the instrument since they signed it").

Regarding Berg's contention of an "implied condition," Louisiana law is clear that employers have the unilateral right to change, modify, or reduce an at-will employee's compensation at any time for any reason. *Trigg v. Pennington Oil Company*, 835 So. 2d 845, 848 (La. App. 1 Cir. 2002) (holding that, because employment was at-will, employer was free to modify terms of employment at any time); LA. CIV. CODE ART. 2747 ("A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for so doing.  The servant is also free to depart without assigning any cause.").  Berg was an at-will employee of Sage, *see* Exhibit B-1 at 184, 190 (Berg stating that he was an at-will employee and "Sage had the ability to cut [his] compensation"), and Berg's own deposition testimony states that he voluntarily resigned and was not claiming he was constructively discharged. Exhibit B-1 at 324-25.  Berg cannot claim now that Sage forced him from his employment and therefore he should be released from his obligation to repay the $30,000 contingent upon his completion of one year of employment.  Berg bore these risks of reduced compensation when he accepted employment with Sage after resigning from ERM; it is unfortunate that he did not secure any protection for

himself through an employment contract or other means.  Berg did not fulfill the conditions on which his signing bonus was contingent.  Accordingly, summary judgment on Sage's claims of contract and quasi-contract is granted.

Berg also contends that -- if he owes any of the $30,000 to Sage -- such recovery would be limited to the pro rata portion of the bonus.  Berg Motion at 46 ("the claim is limited to 21/365 of $30,000").  The court disagrees.  Berg was found not to fulfill the conditions of his bonus, so he has no right to the monies -- it must be paid back in its entirety.  See *Hinton v. Owensby & Kritikos, Inc.*, 425 So. 2d 926, 929 (La. App. 4 Cir. 1986) (citing *Pender v. Power Structures, Inc.*, 359 So. 2d 1321 (La. App. 4 Cir. 1978), and noting that because the employee was terminated before incentive payments had accrued, the employee was not owed any portion of the bonus); *Morse*, 344 So. 2d at 1369 (holding that the employee was not owed any monies from his retirement plan -- the employee was not employed as of the vesting date, so the conditions by which to accrue benefits had not been met).  Accordingly, summary judgment is denied to Berg on this claim.

## b.  Fraud

Unlike all other counterclaims against Berg, Sage does not move for summary judgment on its fraud claim.  Sage Motion at 1 n.1.  Berg, however, does request summary judgment on this counterclaim.  Berg Motion at 41.

Under Louisiana law, fraud can only be proven when there is both an intent to defraud and actual or potential loss or damage. *Sun Drilling Products*, 798 So. 2d 1141, 1152. In addition, another element, whether it be "labeled reliance, inducement, or causation" is required. *Id*. at 1153. Only a preponderance of the evidence is required to prevail on this cause of action and circumstantial evidence may be considered. *Id*.

Despite Berg's assertions, both the United States Supreme Court and Louisiana jurisprudence instruct that claims involving determination of intent are "not generally amenable for summary judgment disposition because [they] 'frequently turn on credibility assessments.'" *Kadlec Medical Center v. Lakeview Anesthesia Associates*, No. 04-0997, 2005 WL 1309153, at *11 ( E.D. La. May 19, 2005) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 599 (1998); citing *Coates v. Anco Insulations, Inc.*, 786 So. 2d 749, 754 (La. App. 4 Cir. 2001)). Without the benefit of hearing Berg's testimony, the court is unable to determine his intent when he accepted his $30,000 signing bonus and offer of employment with Sage. In addition, Sage has pointed to other circumstantial evidence that -- in conjunction with Berg's failure to perform under the contract despite retaining the $30,000 -- supports Sage's claim for fraud. *See* Sage Response at 24 (noting that Berg currently denies the contingent nature of the signing bonus and that Berg resigned his position with Sage two days following the settlement of a lawsuit with his former employer, indicating

- 47 -

Berg's intent to accept a position with Sage "to obtain leverage over ERM in order to maximize the value of his ERM shares of stock").  Berg has not sustained his burden in moving for summary judgment on this counterclaim.  Accordingly, Berg's motion on Sage's fraud counterclaim is denied.

### III.  CONCLUSION

For the reasons stated above, the motions are **GRANTED** in part and **DENIED** in part.  Summary judgment is **GRANTED** to Sage on Berg's claim for indemnification under the TBCA and Berg's claim for sick leave.  Summary judgment is also **GRANTED** to Sage on its counterclaims of contract and quasi-contract.  Summary judgment is **DENIED** on all remaining claims.

**SO ORDERED**.

August 16, 2006.

A. JOE FISH
CHIEF JUDGE

- 48 -